Dissenting-in-part opinion filed by
MOORE, Circuit Judge, in which RADER, Chief Judge, and LINN and O’MALLEY, Circuit Judges, join.
I am concerned that the current interpretation of § 101, and in particular the abstract idea exception, is causing a free fall in the patent system. The Supreme Court has taken a number of our recent decisions and, in each instance, concluded that the claims at issue were not patent-eligible. See Bilski, Prometheus, Myriad (under consideration). Today, several of my colleagues would take that precedent significantly further, lumping together the asserted method, media, and system claims, and holding that they are all patent-ineligible under § 101. Holding that all of these claims are directed to no more than an abstract idea gives staggering breadth to what is meant to be a narrow judicial exception. And let’s be clear: if all of these claims, including the system claims, are not patent-eligible, this case is the death of hundreds of thousands of patents, including all business method, financial system, and software patents as well as many computer implemented and telecommunications patents.[1] My colleagues believe that the trajectory the Supreme Court has set for § 101 requires us to conclude that all of the claims at issue here are directed to unpatentable subject matter. Respectfully, my colleagues are wrong.
*1314 To get to their conclusion, my colleagues trample upon a mountain of precedent that requires us to evaluate each claim as a whole when analyzing validity. As the Supreme Court recognized in Bilski, whether a claim is tied to a machine is “an important and useful tool” for assessing that it is directed to patent eligible subject matter. Bilski v. Kappos, — U.S. -, 130 S.Ct. 3218, 3227, 177 L.Ed.2d 792 (2010). The claimed data processing system at issue here does not incorporate a machine into the claim in a manner that would constitute insignificant pre- or post-solution activity. These claims are to a system of tangible machine components with limited specialized functions programmed consistent with detailed algorithms disclosed in the patent. How can this system, with its first party device, data storage unit, second party device, computer, and communications controller, be an “abstract idea”? Although these claims could certainly be challenged under § 102 or § 103 or even § 112, no contortion of the term “abstract idea” can morph this physical system into an abstract idea.
Our court is irreconcilably fractured over these system claims and there are many similar cases pending before our court and the district courts. It has been a very long time indeed since the Supreme Court has taken a case which contains patent eligible claims. This case presents the opportunity for the Supreme Court to distinguish between claims that are and are not directed to patentable subject matter. For the reasons explained herein, I write separately to explain why the system claims at issue are directed to patent eligible subject matter.
I.
Although the Supreme Court’s recent decisions in Prometheus and Bilski do not address system claims, they certainly provide guidance on the abstract idea exception. In Bilski, the Court held that claims directed to a method of hedging risk in the energy market were not patent-eligible because they covered no more than an abstract idea. 130 S.Ct. at 3231. The Court held that while the machine-or-transformation test is- not the “sole test” for deciding whether an invention is patent eligible, it “is a useful and important clue.” Id. at 3227. Bilski makes clear the Court’s view that a method claim may be patent-eligible under § 101 even if it is not tied in any way to a machine. Id. The Court reasoned that requiring a machine tie would risk stifling innovation by “creat[ing] uncertainty as to the patentability of software, advanced diagnostic medicine techniques, and inventions based on linear programming, data compression, and the manipulation of digital signals.” Id.
Although the Court held that a machine tie is not necessary, it explained that a method claim’s recitation of machine limitations is a “useful and important clue” that the claim is patent-eligible. Id. This is because incorporating machine elements, such as computer hardware, helps to limit the claim to a practical application of any underlying idea. It is true that, if the machine is mere insignificant post-solution activity or data gathering antecedent to performance of a claimed method, then its incorporation into a claim to an otherwise patent-ineligible abstract idea would not be sufficient to avoid the abstract idea exception to patent-eligibility. See Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 1301, 182 L.Ed.2d 321 (2012); Bilski, 130 S.Ct. at 3231. But if meaningfully tying a method to a machine can be an important indication of patent-eligibility, how can a claim to the machine itself, with all its structural and functional limitations, not be patent-eligible?
In Prometheus, the Court held that claims directed to a method of optimizing *1315 therapeutic efficacy of a drug were not patent-eligible. Prometheus, 132 S.Ct. at 1305. The Court, however, also cautioned that “too broad an interpretation” of the abstract idea exception to § 101 “could eviscerate patent law” because “all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.” Id. at 1293. The Court thus reiterated the rule from Diehr that, although an abstract idea itself is not patent-eligible, “an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.” Id. at 1293-94. This distinction between an abstract idea and its application reflects a delicate balance between promoting innovation through patents and preventing monopolization of the basic tools of scientific and technological work. Id. at 1293, 1301-02. The key question is thus whether a claim recites a sufficiently concrete and practical application of an abstract idea to qualify as patent-eligible.
Prometheus instructs us to answer this question by determining whether a process involving a natural law or abstract idea also contains an “inventive concept,” which it defined as “other elements or a combination of elements ... sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself.” Id. at 1294. The Court reiterated that the “inventive concept” must be something more than limiting the invention to a particular technological environment or adding data-gathering steps or other insignificant post-solution activity. Id. at 1294, 1299. In other words, “one must do more than simply state the law of nature while adding the words ‘apply it.’ ” Id. at 1294. This language is a reminder of the long-understood principle that adding insignificant pre- or post-solution activity to an abstract idea does not make the claim any less abstract. See, e.g., Diehr, 450 U.S. at 191-92, 101 S.Ct. 1048 (“[Insignificant post-solution activity will not transform an unpatentable principle into a patentable process.”); Parker v. Flook, 437 U.S. 584, 590, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance.”).
My colleagues erroneously apply Prometheus’s “inventive concept” language by stripping away all known elements from the asserted system claims and analyzing only whether what remains, as opposed to the claim as a whole, is an abstract idea. See Lourie Op. at 1290-91. From this flawed analysis, they conclude that “the system claims are little different” from the asserted method claims. Lourie Op. at 1290. This approach is inconsistent with the 1952 Patent Act, and years of Supreme Court, CCPA, and Federal Circuit precedent that abolished the “heart of the invention” analysis for patentability.
Moreover, my colleagues’ analysis imbues the § 101 inquiry with a time-dependency that is more appropriately the province of §§ 102 and 103. It is true that the analyses of patent-eligibility under § 101 and novelty under § 102 may sometimes overlap. See Prometheus, 132 S.Ct. at 1304. But § 101 is not a moving targeUclaims should not become abstract simply through the passage of time. Under my colleagues’ approach, however, a system claim that passes § 101 when the patent issues could later magically transform into an abstract idea simply because certain computer hardware elements no longer seem inventive.
Bilski and Prometheus follow on a long line of Supreme Court cases that distinguish between machine claims and method claims on the basis that a machine covers an application of any underlying idea rath *1316 er than the idea itself. For example, although a claim’s statutory class is not dis-positive of the § 101 inquiry, the Supreme Court explained in Burr v. Duryee that a machine is a concrete thing, not an idea:
A machine is a concrete thing, consisting of parts, or of certain devices and combinations of devices. The principle of a machine is properly defined to be ‘its mode of operations,’ or that peculiar combination of devices which distinguish it from other machines. A machine is not a principle or an idea.
68 U.S. (1 Wall.) 531, 570, 17 L.Ed. 650 (1863) (emphases added). The Court explained that, “[bjecause the law requires a patentee to explain the mode of operation of his peculiar machine, which distinguishes it from others, it does not authorize a patent for a ‘mode of operations as exhibited in a machine.’ ” Id. In other words, the requirement of specifying the particular limitations and structure of a claimed machine meaningfully limits the claim, such that it amounts to more than the principle or idea that it embodies. The Court later reiterated this distinction, stating that “[a] machine is a thing. A process is an act, or a mode of acting. The one is visible to the eye,—an object of perpetual observation. The other is a conception of the mind, seen only by its effects when being executed or performed.” Expanded Metal Co. v. Bradford, 214 U.S. 366, 384, 29 S.Ct. 652, 53 L.Ed. 1034 (1909) (quoting Tilghman v. Proctor, 102 U.S. 707, 728, 26 L.Ed. 279 (1880)).
Our court, sitting en banc, applied these principles to hold patent-eligible a claim that would read on a general purpose computer programmed to carry out the operations recited in the claim. In re Alappat, 33 F.3d 1526, 1545 (Fed.Cir.1994) (en banc). We stated that, although many of the means-plus-function elements recited in the only asserted independent claim represent circuitry elements that perform mathematical calculations, “the claimed invention as a whole is directed to a combination of interrelated elements which combine to form a machine” for performing the invention’s anti-aliasing technique. Id. at 1544. We explained that “[tjhis is not a disembodied mathematical concept which may be characterized as an ‘abstract idea,’ but rather a specific machine.” Id. The patent applicant admitted that its claim “would read on a general purpose computer programmed to carry out the claimed invention.” Id. at 1545. We nonetheless held that the claim was patent-eligible under § 101, explaining that “such programming creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.” Id. (emphasis added). Judge Lourie’s opinion completely repudiates Judge Rich’s approach in Alappat. The two are not reconcilable.
The Supreme Court has never cast doubt on the patentability of claims such as those at issue in In re Alappat or the system claims at issue in this case. Indeed, Alappat’s reasoning is completely consistent with Bilski, Prometheus, and the Supreme Court’s other § 101 cases. Unlike a claim reciting a method and simply saying “apply it” on a general purpose computer, a system claim’s structural limitations restrict the claimed machine by requiring certain physical components. These concrete elements are precisely the sort of “inventive concept” that meaningfully limits the claim, preventing it from “tying up” the underlying abstract idea itself. Although the individual components themselves may not be new or innovative, the particular combination of components recited in the claim results in a brand new machine—a special purpose computer. Id.
Some simple examples illustrate these principles. Even though the concept of *1317 addition is an abstract idea, the first calculator that could perform addition was a patent-eligible machine under § 101. If someone subsequently discovered that, by rewiring the calculator, it could perform addition and subtraction (both abstract mathematical concepts), the improved calculator would similarly be patent-eligible. The act of modifying the circuitry of a known device such that it is configured to apply an abstract idea does not transform it into an abstract idea. If the subsequent inventor were able to reprogram the calculator to perform subtraction (rather than rewire it), it would still be directed to patent-eligible subject matter. That is what software does—it effectively rewires a computer, making it a special purpose device capable of performing operations it was not previously able to perform. Both the software and the computer running the software are patentable subject matter and should pass through the § 101 gate.
The parties in this case agree that if someone sought to patent a general purpose computer, it would satisfy § 101 (although it may fail § 102 or § 103). Why, then, would claiming the same computer with specific programming (thus creating a special purpose computer), transform a patent-eligible machine into a patent-ineligible abstract idea? A claim to a computer running particular software is no less a claim to a computer.
None of this is to suggest that system claims may never be abstract, or that merely adding a computer to a method step can transform a patent-ineligible claim into one that satisfies § 101. But a claim to a structurally defined machine is more than a method claim rewritten in system form. It is a practical application of the underlying idea, limited to the specific hardware recited and the algorithms disclosed to perform the recited functions.
III.
The only way to determine if Alice’s asserted system claims are merely directed to an abstract idea is to analyze each claim as a whole, looking at the language of the claims. Claim 1 of the '375 patent, for example, recites:
A data processing system to enable the exchange of an obligation between parties, the system comprising:

a first party device,

a data storage unit having stored therein
(a) information about a first account for a first party, independent from a second account maintained by a first exchange institution, and
(b) information about a third account for a second party, independent from a fourth account maintained by a second exchange institution;
and a computer, coupled to said data storage unit, that is configured to
(a) receive a transaction from said first party device;
(b) electronically adjust said first account and said third account in order to effect an exchange obligation arising from said transaction between said first party and said second party after ensuring that said first party and/or said second party have adequate value in said first account and/or said third account, respectively; and
(c) generate an instruction to said first exchange institution and/or said second exchange institution to adjust said second account and/or said fourth account in accordance with the adjustment of said first account and/or said third account, wherein said instruction being an irrevocable, time invariant obligation placed on said first ex *1318 change institution and/or said second exchange institution.
'375 patent claim 1 (emphases added).
The claimed data processing system recites three structural components: a computer, a first party device, and a data storage device. The specification describes the invention: the “core of the system hardware is a collection of data processing units.” '375 patent col.7 11.22-23. Each processing unit is operably connected to one or more mass data storage units. Id. eol.711.39-43.
The claimed data processing system is further limited to one that is configured to perform certain functions in a particular fashion: “receive a transaction from said first party device,” “electronically adjust” the parties’ accounts, and “generate an instruction.” The specification discloses numerous flow diagrams in Figures 8-16 and 18^40 that provide algorithm support for the software that performs these functions. '375 patent col.7 11.29-33. The “flow charts in FIGS. 8 to 16 depict the processing flow of the matching system for primary product orders submitted by ordering party stakeholders____” Id. col.16 11.42-44. More specifically, Figures 11-15 provide an explanation of the process through which counterparties are matched (“order matching”). Id. col.17 11.55-56. Figure 15 depicts the process of identifying a potential counterparty from a short list, and is a useful example of the level of detail that the specification provides regarding the claimed functions:
*1319 [[Image here]]
The specification explains that this algorithm includes the steps of checking to make sure the counterparty short list is not empty and, if it is not, identifying the lowest priced counterparty on the short list. '375 patent col.19 11.55-63. This corresponds to blocks 1560 and 1570 in Figure 15. The system does this based on the counterparty’s bid price (PRICE (SID)). Id. col.19 1.63-col.20 1.2. The system rejects matches in which the counterparty’s bid price is greater than the ordering party’s maximum price (block 1612). Id. col.20 11.8-11. The system then checks the order against all of the applicable limits and calculates the portion of the order which will not violate the counterparty limits (blocks 1590, 1602, 1604, and 1606). Id. *1320 col.20 11.18-37. If some portion of the order is matched, the system notes the identification of the matching counterparty and confirms the matched order using the process detailed in Figure 16 (the “matched order confirmation” process). Id. col.20 11.41-49. The process depicted in Figure 15 and described in the specification is just one of the processes included in the claim element “receive a transaction from said first party device.”
Looking at these hardware and software elements, it is impossible to conclude that this claim is merely an abstract idea. It is a pure system claim, directed to a specific machine configured to perform certain functions. Indeed, the computer covered by this claim is a tangible item that you could pick up and put on your desk. It is not a method claim simply disguised as a machine claim, nor does it incorporate the computer elements in an insignificant way. The asserted data processing systems claimed in the '720 and '375 patents recite additional structural limitations (including a second party device and a communications controller). And the dependent claims (which are also asserted and must be analyzed individually) limit the computer system even further. Some recite a “means for allowing said first party to’ acquire an item from said second party, wherein the exchange obligation relates to said item.” See, e.g., '375 patent claims 11, 24, and 36; see also '720 patent claims 27, 59, 67, 79, and 84. These claims expressly cover only the algorithm disclosed as a means for performing the acquisition, or equivalents thereof. See, e.g., Aristocrat Techs. Austl. Pty Ltd. v. Int’l Game Tech., 521 F.3d 1328, 1333 (Fed.Cir.2008). Judge Lourie’s opinion does not individually analyze any of these claims. If these claims do not clear the § 101 hurdle, then the abstract idea exception will be an insurmountable bar for innovators of software, financial systems and business methods, as well as for those in the telecommunications field. Every software patent makes a computer perform different functions— that is the purpose of software. Each software program creates a special purpose machine, a machine which did not previously exist (assuming the software is novel). The machine ceases to be a general purpose computer when it is running the software. It does not, however, by virtue of the software it is running, become an abstract idea.
It bears repeating that the computer limitations in these claims are not insignificant pre- or post-solution activity. Nor does this conclusion “exalt form over substance” or allow the “draftsman’s art” to dictate patent-eligibility. Prometheus, 132 S.Ct. at 1294. These are not just method claims masquerading as system claims— they are detailed, specific claims to a system of particular hardware programmed to perform particular functions. The computer in the system claims is the entire detailed “solution,” without which it would be impossible to achieve the invention’s purpose. The Bilski court explained that substantial machine limitations would be a “useful and important clue” that method claims are patent-eligible. See Bilski, 130 S.Ct. at 3227. These claims are far more limited. They cover the machine itself; the machine is the invention.
It is important to remember that, regardless of whether we hold these claims to be patent-eligible, they may well fail to meet the other requirements for patent protection. Taking a known or abstract idea and simply putting it on a computer is likely not entitled to patent protection. Section 102’s novelty or § 103’s nonobviousness requirements are the means to challenge a system claim that does no more than take a familiar, well known concept and put it on a computer. Or, if the claim is to a machine whose precise structure or method of operation is not *1321 sufficiently detailed (think perpetual motion machine), then § 112 would prevent patentability. When you walk up to the § 101 gate holding a computer in your arms (or software for that matter), you should not be rejected because your computer is an abstract idea.
For the reasons given, above, I believe that Alice’s asserted system claims are patent-eligible under § 101. I would thus reverse the district court’s judgment with respect to those claims.
Concurring-in-part and dissenting-in-part opinion filed by NEWMAN, Circuit Judge.

. If all of the claims of these four patents are ineligible, so too are the 320,799 patents which were granted from 1998-2011 in the technology area “Electrical Computers, Digital Processing Systems, Information Security, Error/Fault Handling.” See U.S. Patent & Trademark Office, Selected Technology Report, available at http://www.uspto.gov/web/ offices/ac/ido/oeip/taf/ec_dps_is_efh.htm. Every patent in this technology category covers inventions directed to computer software or to hardware that implements software. In 2011 alone, 42,235 patents were granted in this area. Id. 'This would render ineligible nearly 20% of all the patents that actually issued in 2011. If the reasoning of Judge Lourie’s opinion were adopted, it would decimate the electronics and software industries. There are, of course, software, financial system, business method and telecom patents in other technology classes which would also be at risk. So this is quite frankly a low estimate. There has never been a case which could do more damage to the patent system than this one.